UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

EDWARD KRAMER,                          :
                                        :
        Plaintiff,                      :
                                        :
v.                                      :   Case No. 3:15-cv-00251 (RNC)
                                        :
STATE OF CONNECTICUT,                   :
DEPARTMENT OF CORRECTION,               :
LEO ARNONE,                             :
PETER MURPHY, and                       :
JUSTIN CAPUTO,                          :
                                        :
        Defendants.                     :

RULING AND ORDER

     Plaintiff Edward Kramer brings this action against the

State of Connecticut, the Department of Correction ("DOC"),

former DOC Commissioner Leo Arnone, former Warden Peter Murphy

and Correction Officer Justin Caputo.  The action arises from

plaintiff's incarceration as a pretrial detainee at MacDougall-

Walker Correctional Institution ("MWCI") from 2011 to 2013.  The

third amended complaint ("the complaint") does not specify the

nature of the claims against the State and DOC but is properly

construed as asserting a claim against the State under the

Americans With Disabilities Act and the Rehabilitation Act.[1]  The

_____

[1]  States and state agencies cannot be held liable under 42
U.S.C. § 1983, so the ADA and Rehabilitation Act claim must be
the one plaintiff is asserting against these defendants.  See
Caroselli v. Curci, 371 F. App'x 199, 202 (2d Cir. 2010) ("[A]
state is not a 'person' amenable to suit under § 1983.");  Bhatia
v. Conn. Dep't of Children & Families (DCF), 317 F. App'x 51, 52
(2d Cir. 2009) (same for state agencies).  Moreover, "actions

1

claims against Arnone and Murphy are brought under 42 U.S.C. §
1983 and allege deliberate indifference to his serious medical
needs and interference with his free exercise of religion.[2]  The
claim against Caputo, also brought under § 1983, alleges
deliberate indifference to plaintiff's safety.  Defendants have
moved for summary judgment on all the claims.  For reasons
discussed below, the motion is granted in full.

I. Legal Standard

Summary judgment may be granted when there is no genuine
issue of material fact and the moving party is entitled to
judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S.
317, 322 (1986).  "In moving for summary judgment against a
party who will bear the ultimate burden of proof at trial, the
movant's burden will be satisfied if he can point to an absence
of evidence to support an essential element of the nonmoving

_____

brought against a state agency are actions against the state
itself." Smith v. Schwartz, No. CV 98-2838 (RJD), 1999 WL
294733, at *1 (E.D.N.Y. Mar. 22, 1999) (citing Pennhurst State
Sch. & Hosp. v. Halderman, 465 U.S. 89, 99-100 (1984)).
Accordingly, I interpret the ADA and Rehabilitation Act claim to
be against the State alone.  There being no claim against the
DOC, it is dismissed as a defendant.
[2] The complaint attempts to bring the ADA and Rehabilitation Act
claim against Murphy and Arnone in their individual capacities,
but they are not subject to suit under the ADA or Rehabilitation
Act.  See Darcy v. Lippman, 356 F. App'x 434, 437 (2d Cir. 2009)
(citing Garcia v. SUNY Health Scis. Ctr. of Brooklyn, 280 F.3d
98, 107 (2d Cir. 2001)) (Rehabilitation Act); Corr v. MTA Long
Island Bus, 199 F.3d 1321 (2d Cir. 1999) (ADA); see also Dean v.
Univ. at Buffalo Sch. of Med. & Biomedical Scis., 804 F.3d 178,
185 n.2 (2d Cir. 2015) (both).

party's claim." Goenaga v. March of Dimes Birth Defects Found.,
51 F.3d 14, 18 (2d Cir. 1995) (citing Celotex, 477 U.S. at 322-
23). To avoid summary judgment, the plaintiff must point to
evidence that would permit a jury to return a verdict in his
favor. Id.; see also Anderson v. Liberty Lobby, Inc., 477 U.S.
242, 252 (1986). If the evidence in the record is legally
insufficient to support a verdict in favor of the plaintiff,
there is no need for a trial because even if the jury were to
return a verdict in his favor, the verdict would have to be
overturned due to the lack of sufficient evidentiary support.
In deciding whether the evidence is legally sufficient to
support the plaintiff's claim, the evidence must be viewed in
the light most favorable to him. Anderson, 477 U.S. at 255.
But the Court is "not required to scour the record on its own in
a search for evidence when the plaintiff[] fail[s] to present
it." CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP, 735
F.3d 114, 125 (2d Cir. 2013) (internal quotation marks omitted).

Under the Local Rules, parties briefing motions for summary
judgment must attach statements of undisputed material facts.[3]
See D. Conn. L. Civ. R. 56(a). Each material fact must be

---

[3] Plaintiff faults defendants for not complying with the
formatting requirements of Local Rule 56(a). In fact, neither
party complied with the formatting requirements. I fault
neither side for formatting errors but take account of
substantive problems with the Local Rule 56(a) statements.

supported "by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial." Id. R. 56(a)(3). "Each material fact set forth in the [movant's] Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the [non-movant's] Statement . . . or the Court sustains an objection to the fact." Id. R. 56(a)(1).

Plaintiff's Local Rule 56(a) statement cites heavily to hearsay sources such as his grievance forms. The exhibits include deposition testimony from plaintiff, but no affidavit from him. Attempting to remedy this problem, plaintiff argues that hearsay evidence is sufficient to defeat summary judgment if there is reason to believe that the evidence can be offered in admissible form at trial. But Local Rule 56(a)(3) is clear: "each denial" in plaintiff's Local Rule 56(a)(2) statement "must be followed by a specific citation to" either "the affidavit of a witness competent to testify as to the facts at trial" or "other evidence that would be admissible at trial." In the absence of an affidavit, any hearsay evidence that would not be admissible at trial may not be considered at this stage.[4]

---

[4] Plaintiff has offered evidence in the form of statements by the defendants that would be hearsay if introduced by the defendants, such as their responses to his grievance filings. To the extent the statements "furnish relevant evidence against"

Accordingly, I deem admitted those facts from the defendants'
Local Rule 56(a) statement that are supported by the record and
uncontradicted by admissible evidence.

II. Discussion

In the fall of 2011, plaintiff was housed at MWCI as a
pretrial detainee in connection with charges then pending in
Georgia.

From December 2011 until he was returned to Georgia in
January 2013, he was housed in the inpatient medical unit.

In February 2012, another detainee named Leon Owens was
assigned to the bed next to plaintiff's in MWCI's medical unit.
On February 21, a third pretrial detainee, Kevin Maslak, changed
the television channel while Owens was sleeping.  Owens was
awakened as a result of the change of channels.  He approached
Maslak and threatened to kill him.  Any potential assault was
halted by the intervention of staff.

Plaintiff reported this incident to Caputo, telling him
"that for changing the TV while he was asleep, Mr. Owens

---

a defendant, they are admissible as statements of a party
opponent.  Paul F. Rothstein, Federal Rules of Evidence art.
VIII (3d ed. 2002 & Supp. 2019) (discussing Fed. R. Evid.
801(d)(2)).  Because the exhibits were introduced by plaintiff,
however, the Court may also consider aspects of the statements
favorable to defendants' position.  "[Plaintiff] waived any
objections to the admissibility of the [exhibits] by offering
them [himself]."  Capobianco v. City of New York, 422 F.3d 47,
55 (2d Cir. 2005); see also Estrada v. Torres, 646 F. Supp. 2d
253, 255 & n.1 (D. Conn. 2009).

threatened to kill another inmate and I felt the need that that
would be something that I should report to you."  Pl. Dep., ECF
No. 132-3, at 18.  Caputo brushed it off, saying this type of
thing happens in prison.

Caputo did not report the incident to his superiors, but
plaintiff reported it to Murphy.  Murphy and the medical staff
-- but not Caputo -- had the power to place inmates into
particular units or wards within the medical unit.

During the morning of February 23, Owens made anti-Semitic
remarks then viciously attacked plaintiff, who is Jewish.
Plaintiff was in bed at the time making him particularly
vulnerable to the assault.  Owens fractured plaintiff's nose,
knocked him unconscious, and delivered blows to his chest and
stomach.  Caputo was not present when this attack occurred.

Plaintiff claims that while he was at MWCI, he was denied
access to appropriate medical care, the library, outdoor
recreation, and proper religious accommodations.

A.  Deliberate Indifference to Physical Safety

Plaintiff claims that Caputo was deliberately indifferent
to his physical safety in the two days leading up to the assault
by Owens on February 23.[5]  Because plaintiff was a pretrial

_____

[5] For the first time in his objection to defendants' summary
judgment motion, plaintiff appears to allege this claim against
Murphy as well on the basis that he told Murphy about the
February 21 incident, stated he feared for his life, and

detainee, this claim falls under the Fourteenth Amendment.[6]

Conquistador v. Adamaitis, No. 3:19-CV-430 (KAD), 2019 WL
1573710, at *2 (D. Conn. Apr. 11, 2019); see Darnell, 849 F.3d
at 29.

To prevail on this claim, plaintiff must satisfy two
prongs.  First, he must show that he was incarcerated under
conditions posing a substantial risk of serious harm.  Farmer v.
Brennan, 511 U.S. 825, 834 (1994).  This prong is satisfied
when, for example, "prison guards simply stand by and permit an
attack on an inmate by another inmate to proceed" or "where
there is prior hostility between inmates, or a prior assault by

---

requested that Murphy move Owens elsewhere.  The claim is
alleged against Caputo alone in plaintiff's Third Amended
Complaint, his January 11 and 25, 2019 statements of claims, and
counsel's representations at the December 12, 2018 final
pretrial conference.  Plaintiff may not raise new claims in his
responsive briefing.  See Greenidge v. Allstate Ins. Co., 446
F.3d 356, 361 (2d Cir. 2006) (upholding the district court's
decision not to consider an argument raised for the first time
in the party's opposition to summary judgment because "a
district court does not abuse its discretion when it fails to
grant leave to amend a complaint without being asked to do so");
Auguste v. Dep't of Corr., 424 F. Supp. 2d 363, 368 (D. Conn.
2006) (collecting cases); 5 Charles Alan Wright & Arthur R.
Miller, Federal Practice and Procedure § 1183 n.9 (3d ed. 2004)
("An opposition to a summary judgment motion is not the place
for a plaintiff to raise new claims.").  Accordingly, I analyze
the claim only as to Caputo.
[6] For a sentenced inmate, the claim would fall under the Eighth
Amendment.  "A detainee's rights are 'at least as great as the
Eighth Amendment protections available to a convicted
prisoner.'"  Darnell v. Pineiro, 849 F.3d 17, 29 (2d Cir. 2017)
(quoting City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244
(1983)).

one inmate on another, and those inmates are not kept out of contact from one another." <u>George v. Burton</u>, No. 00 CIV. 143 (NRB), 2001 WL 12010, at *3 (S.D.N.Y. Jan. 4, 2001) (collecting cases). Second, he must prove that Caputo knew of the need to protect the plaintiff against an excessive risk to his physical safety yet failed to act to mitigate the risk. <u>Darnell</u>, 849 F.3d at 35. In other words, more than "mere negligence" is required. <u>Id.</u> at 36; <u>see also</u> <u>Hodge v. City of New York</u>, No. 19-CV-2474 (CM), 2019 WL 1455170, at *2 (S.D.N.Y. Apr. 1, 2019) (applying <u>Darnell</u> to a deliberate indifference to physical safety claim).

A triable of issue of fact may well arise in a case where a defendant "had prior knowledge that [another inmate] had made death threats against the plaintiff which were ignored." <u>Ayers v. Coughlin</u>, 780 F.2d 205, 207 (2d Cir. 1985); <u>see also</u> <u>Morales v. N.Y. State Dep't of Corr.</u>, 842 F.2d 27, 30 (2d Cir. 1988) (allowing claim to proceed where plaintiff alleged "that he complained to [the defendant], only a few hours before the . . . attack, that [the other inmate] had tried to attack him the night before and would probably do so again"). By contrast, "there can be no liability absent a particularized threat to the inmate's safety . . . ." <u>Shell v. Brun</u>, 585 F. Supp. 2d 465, 470 (W.D.N.Y. 2008). An exception to this general rule exists where "the official acted or failed to act despite his knowledge

of a substantial risk of serious harm," for example, where the
plaintiff "presents evidence showing that a substantial risk of
inmate attacks was longstanding, pervasive, well-documented, or
expressly noted by prison officials in the past, and the
circumstances suggest that the defendant-official being sued had
been exposed to information concerning the risk and thus must
have known about it . . . ." Farmer, 511 U.S. at 842–43
(internal quotation marks omitted).  Yet "[e]ven if, in
hindsight, it might have been wiser to have moved plaintiff to a
different area sooner, that will not give rise to a
constitutional claim.  As stated, mere negligence is not
enough." Shell, 585 F. Supp. 2d at 470.

Because Caputo had no power over housing assignments and
was not present on the day Owens attacked the plaintiff, the
claim against Caputo rests on the fact that plaintiff informed
him about the threats Owens made to Maslak.  Plaintiff did not,
however, tell Caputo that Owens had made threats directed at
him, and there is no evidence of any such threats.  Nor is there
any evidence that Owens had previously attacked others, or that
he had displayed hostility to the plaintiff.  In the absence of
such evidence, plaintiff cannot satisfy either prong of his
claim and Caputo is thus entitled to summary judgment.

B. <u>Deliberate Indifference to Serious Medical Needs</u>

Plaintiff claims that Arnone and Murphy were deliberately indifferent to his serious medical needs in violation of the Fourteenth Amendment. He alleges that under their watch he was at times deprived of a wheelchair; medications for his psoriatic arthritis, chronic pain, hypertension, and diabetes; neurological and podiatric care; and repairs to his portable oxygen concentrator.[7] Arnone and Murphy argue that plaintiff cannot establish their personal involvement in a constitutional violation. I agree.

"[T]he personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." <u>Victory v. Pataki</u>, 814 F.3d 47, 67 (2d Cir. 2016) (internal quotation marks omitted) (quoting <u>Farrell</u>

_____

[7] The original complaint also included reference to deprivation of a cane. Third Amended Complaint, ECF No. 58 ¶¶ 14-16. However, that claim has been withdrawn. <u>See</u> Transcript of Jan. 7, 2019 Teleconference, ECF No. 112 at 13; <u>see also id.</u> at 28. Additionally, in some of the letters and grievances that plaintiff directed toward Arnone or Murphy during his time at MWCI, he mentioned other topics, such as a mattress, problems with cell ventilation, and facial reconstructive surgery after the assault by Owens. Plaintiff has not moved to amend his complaint to add these allegations, and I therefore do not consider them. Similarly, the record shows that a rabbi who advocated for plaintiff during his incarceration at MWCI once alleged that plaintiff had bleeding lesions, but this allegation is not mentioned in the complaint and is therefore not considered. Finally, plaintiff's deposition testimony suggests that he may not have had his personal oxygen concentrator device with him for the first few weeks at MWCI, but no such allegation appears in the complaint.

v. Burke, 449 F.3d 470, 484 (2d Cir. 2006)), as amended (Feb.
24, 2016).  Vicarious liability does not apply; rather, "each
Government-official defendant, through the official's own
individual actions, [must] ha[ve] violated the Constitution" to
be held liable.  Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).
An individual's personal involvement can be established by
demonstrating "intentional participation in the conduct
constituting a violation of the victim's rights by one who knew
of the facts rendering it illegal."  Provost v. City of
Newburgh, 262 F.3d 146, 155 (2d Cir. 2001) (footnote marker
omitted).

    The Second Circuit recognizes several ways of establishing
personal involvement of supervisors:

> The personal involvement of a supervisory defendant may be
> shown by evidence that: (1) the defendant participated
> directly in the alleged constitutional violation, (2) the
> defendant, after being informed of the violation through a
> report or appeal, failed to remedy the wrong, (3) the
> defendant created a policy or custom under which
> unconstitutional practices occurred, or allowed the
> continuance of such a policy or custom, (4) the defendant
> was grossly negligent in supervising subordinates who
> committed the wrongful acts, or (5) the defendant exhibited
> deliberate indifference to the rights of [the plaintiff] by
> failing to act on information indicating that
> unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).[8]  "In
addition to satisfying one of these requirements, a plaintiff

---

[8] The Supreme Court has since rejected the idea that "a
supervisor's mere knowledge of his subordinate's discriminatory

11

must also establish that the supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation." Raspardo, 770 F.3d at 116.

The record does not support a finding of personal involvement in the alleged deprivations of medical care as to either Arnone or Murphy. Arnone's involvement in plaintiff's medical care was extremely limited. Rabbi Menachem Katz, an advocate for plaintiff, emailed Arnone on November 10, 2011 to flag unspecified "issues with medical care." ECF No. 135-3 at 18. Arnone responded the same day that he "had our director of Medical Services look into the issue this afternoon and Mr[.] Kramer will be receiving the medication he was using before coming in." Id. Plaintiff mailed a letter to Arnone dated November 28, 2011, which mentioned problems including lack of access to a neurologist or a wheelchair. See ECF No. 135-2 at 66-67; ECF No. 135-3 at 32-33. Deputy Commissioner James Dzurenda responded to that letter on December 9, 2011. See ECF

---

purpose amounts to the supervisor's violating the Constitution." Iqbal, 556 U.S. at 677. The ruling has "engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in" Colon. Reynolds v. Barrett, 685 F.3d 193, 206 n.14 (2d Cir. 2012). Nevertheless, the Second Circuit has "not yet determined the contours of the supervisory liability test" after Iqbal. Raspardo v. Carlone, 770 F.3d 97, 117 (2d Cir. 2014). It is not necessary for me to resolve that question because all of plaintiff's claims fail against the supervisory defendants, Murphy and Arnone, even under the Colon standard.

No. 135-2 at 68; ECF No. 135-3 at 44. On February 29, 2012,
plaintiff wrote a letter to Arnone alleging a lack of access to
a neurosurgeon. ECF No. 135-3 at 46-49. Specifically, he wrote
that his "case was continued for another month (which means
another month still until I may be able to see my neurosurgeon
-- I still haven't seen any neurosurgeon at all, and all I was
prescribed from the UConn neurologist I was referred to was a
prescription for the best Kosher pastrami sandwich in Hartford
-- on a UConn medical prescription pad script, no less)." Id.
at 47.

    Arnone may not be held liable on this record. The mere
receipt of a letter or grievance, or even the "decision not to
act on a letter received from an inmate[,] are insufficient to
establish personal involvement by a supervisor." Delee v.
Hannigan, 729 F. App'x 25, 32 (2d Cir. 2018) (citing Colon, 58
F.3d at 873-74); see also, e.g., Goris v. Breslin, 402 F. App'x
582, 584 (2d Cir. 2010) (summary judgment was appropriate where
defendant's "personal involvement was limited to the receipt of
two letters from [plaintiff], which he promptly referred to
other individuals for investigation and response"); Mateo v.
Fischer, 682 F. Supp. 2d 423, 430 (S.D.N.Y. 2010) (collecting
cases). Arnone referred the November 10 and 28, 2011
correspondence to appropriate subordinates, after which either

                              13

he or the subordinate responded.[9]  There is no evidence in the
record that he acted on the February 2012 letter, but that alone
is insufficient to show personal involvement.[10]  <u>Delee</u>, 729 F.
App'x at 32.

Murphy's involvement in plaintiff's medical care was also
too limited to support a claim.  Plaintiff filed a grievance in
February 2012 alleging that when he went to the hospital
following the February 23 assault by Owens, Correction Officers
forced him to walk instead of letting him use wheelchair and
taunted him.  Murphy denied the grievance, writing that it could
not be substantiated.  ECF No. 135-3 at 1-3.

"The district courts within this Circuit are divided
regarding whether review and denial of a grievance constitutes
personal involvement in the underlying alleged unconstitutional
act."  <u>Young v. Choinski</u>, 15 F. Supp. 3d 172, 191 (D. Conn.

---

[9] Additionally, plaintiff's statement in his deposition that he
received "documents that were signed by Commissioner Arnone . .
. at least twice" is insufficient to create a triable issue of
fact.  Pl. Dep., ECF No. 132-3, at 14; <u>see also</u> <u>id.</u> at 22.  He
provides no detail about those documents, so there can be no
reasonable inference that they pertained to the subject matter
of this lawsuit or that they involved a constitutional
violation.
[10] Furthermore, there is no evidence in the record that
plaintiff's inability to access a neurosurgeon was an urgent
condition.  The vague allegations in plaintiff's letter,
including the reference to a prescription for a sandwich, could
not have put Arnone on notice that plaintiff was suffering a
"condition of urgency such as one that may produce death,
degeneration, or extreme pain."  <u>Charles</u>, 925 F.3d at 86.

14

2014) (internal quotation marks omitted) (collecting cases).
"[D]enial of a grievance alone may be insufficient to establish
the 'personal involvement' of a supervisory official." Id.
However, if the defendant "failed to respond adequately upon
receiving notice of a violation that could be remedied, such as
an 'ongoing' violation, he may be held liable. In the absence of
an ongoing violation —- one that is capable of mitigation —-
[the defendant] cannot be held personally liable." Id. at 192-
93 (citations omitted).

The record does not support the existence of an ongoing
violation here. Plaintiff admitted in his deposition that the
medical ward had wheelchairs available. See ECF No. 132-3 at
24. As of November 30, 2011, there was an order in place for
plaintiff to be transported by wheelchair. ECF No. 135-2 at 69.
The record shows only a few instances when plaintiff was
allegedly denied a wheelchair: on November 23, 2011; in the fall
of 2011, when he fell after being refused a wheelchair; and in
March 2012, when a nurse and official would not provide him with
a wheelchair. See id. at 64, 67; ECF No. 135-3 at 4. Assuming
these incidents could be shown by competent evidence,[11] they do
not establish an ongoing violation and there is no evidence that
any of them were brought to Murphy's attention. Furthermore, by

---

[11] As noted previously, plaintiff's own written statements
concerning these matters are hearsay.

plaintiff's own account, the November 23, 2011 wheelchair denial
went against Murphy's orders, as plaintiff wrote that Murphy had
approved transportation in light of plaintiff's medical
wheelchair profile.  ECF No. 135-2 at 64.  Murphy's denial of
plaintiff's February 2012 grievance does not provide sufficient
personal involvement for plaintiff to pursue a claim against
him.[12]

    C.  Free Exercise of Religion

    Plaintiff alleges that Arnone and Murphy interfered with
his First Amendment right to freely exercise his religion.[13]
Specifically, he alleges that his meal plan was not properly
Kosher and was implemented inappropriately; he was at times not
allowed to have certain religious garments, such as a yarmulke
and tzitzit; he was not allowed to have candles or a lamp for
religious celebrations; and he was not permitted to attend

---

[12] Another of plaintiff's advocates, Rabbi Weiss, emailed Murphy
on an unknown date to report that plaintiff's attorney, Fredrick
Todd, told Weiss about various medical complaints from
plaintiff.  ECF No. 135-1 at 37-38.  This email represents
double hearsay and is inadmissible.
[13] Defendants argue that plaintiff has abandoned his First
Amendment claim by providing an insufficient defense of the
claim in his opposition memorandum.  The opposition memorandum,
while lacking in citations to case law, clearly manifests an
intention to pursue the claim.  Therefore, I decline to find
that it has been abandoned.  See Jackson v. Fed. Express, 766
F.3d 189, 196 (2d Cir. 2014).

collective observances.[14]  Arnone and Murphy argue that plaintiff

cannot prevail on his free exercise claim against them because

they were not personally involved in a constitutional violation.

I agree.

"[A]lthough prisoners do not abandon their constitutional

rights at the prison door, lawful incarceration brings about the

necessary withdrawal or limitation of many privileges and

rights, a retraction justified by the considerations underlying

our penal system."  Salahuddin v. Goord, 467 F.3d 263, 274 (2d

Cir. 2006) (internal quotation marks and alterations omitted)

(quoting O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987)).

To prevail on a free exercise claim requires a threshold showing

"that the disputed conduct substantially burdens [the

plaintiff's] sincerely held religious beliefs."[15]  Id. at 274-75.

"The defendants then bear the relatively limited burden of

identifying the legitimate penological interests that justify

the impinging conduct."  If they do so, the plaintiff must

demonstrate "that these articulated concerns were irrational."

---

[14] See Third Amended Complaint, ECF No. 58; Transcript of Jan. 7,
2019 Teleconference, ECF No. 112, at 27-28; Transcript of Dec.
12, 2018 Conference, ECF No. 113, at 3-8.
[15] The Second Circuit has not yet determined whether the
substantial-burden test survives the Supreme Court's decision in
Employment Division v. Smith.  Holland v. Goord, 758 F.3d 215,
220 (2d Cir. 2014) (citing Emp't Div. v. Smith, 494 U.S. 872,
887 (1990)).  I need not address that question because
plaintiff's claims fail for other reasons.

Id. at 275 (internal alterations omitted) (quoting Ford v.
McGinnis, 352 F.3d 582, 595 (2d Cir. 2003)); see also Colliton
v. Gonzalez, No. 07 CIV. 02125 RJH, 2011 WL 1118621, at *3
(S.D.N.Y. Mar. 23, 2011) (describing the defendants' "relatively
limited burden" as "merely one of articulation").

Thus, the key question is whether the challenged policy or
action, although infringing on a constitutional right, "is
reasonably related to legitimate penological interests."
Salahuddin, 467 F.3d at 274 (quoting O'Lone, 482 U.S. at 349);
see also, e.g., Messina v. Mazzeo, 854 F. Supp. 116, 137
(E.D.N.Y. 1994) (applying this standard in the context of
pretrial detention).  To be reasonable, "the challenged
regulation or official action [must] ha[ve] a valid, rational
connection to a legitimate governmental objective."  Salahuddin,
467 F.3d at 274 (footnote marker omitted) (citing Turner v.
Safley, 482 U.S. 78, 90-91 (1987)).  In making this assessment,
courts consider (1) "whether prisoners have alternative means of
exercising the burdened right"; (2) "the impact on guards,
inmates, and prison resources of accommodating the right"; and
(3) "the existence of alternative means of facilitating exercise
of the right that have only a de minimis adverse effect on valid
penological interests."  Id. (citing Turner, 482 U.S. at 90-91).

The record shows only a few communications to Arnone
related to First Amendment issues.  First, there is the November

18

28, 2011 letter from plaintiff to Arnone discussed above, which
included a passing mention of his requests for Kosher meals.
See ECF No. 135-2 at 66-67; ECF No. 135-3 at 32-33.  As noted,
Deputy Commissioner Dzurenda responded to that letter on
December 9.  See ECF No. 135-2 at 68; ECF No. 135-3 at 44.
Similarly, Arnone's name appears in a December 15, 2011 email
from Rabbi Katz, but subsequent communications on that email
string were handled by Murphy.  See ECF No. 135-1 at 33-36; see
also id. at 44 (Murphy forwarded the email string to others,
removing Arnone).  Arnone was also one of a string of DOC
personnel copied on emails in March 2012 regarding Passover
meals, to which Murphy and Director of Legal Affairs Sandra
Sharr responded.  See id. at 50-51; ECF No. 135-2 at 5-11.
Sharr's response was apparently prompted by emails and calls to
various DOC personnel, including communications to Arnone on
February 28 and March 6 and to Murphy on February 27 and March
2.  ECF No. 135-2 at 9-10.  Arnone delegated responsibility for
addressing each of these communications and cannot be held
personally responsible for subsequent violations.  See Goris,
402 F. App'x at 584; Burns v. Trombly, 624 F. Supp. 2d 185, 204–
05 (N.D.N.Y. 2008) ("Defendant Woods (a high-ranking official at
Upstate C.F.) had a right to refer Plaintiff's complaint to his
subordinate officer . . . for investigation and report, and to
rely on that investigation and report.").

On November 10, 2011, Arnone responded to an email from
Rabbi Katz, writing in relevant part that Kramer would "be
receiving a [K]osher meal starting tomorrow at the noon meal.
We are not ready to move forw[a]rd with the program we want to
institute but we can provide Kosher certified food to him until
we are ready to have a program in place."  ECF No. 135-3 at 18.
Plaintiff does not dispute that he received the DOC's Kosher
meal program, called "Common Fare," but he does dispute that
Common Fare is in fact Kosher.  E.g., ECF No. 132-3 at 24.
Plaintiff argues that Arnone's reference to "the program we want
to institute" is an admission that the existing Common Fare
program is not Kosher.

Such a reading of the email is untenable.  The email states
that DOC will provide "Kosher certified food" to plaintiff.  Far
from an admission that Common Fare is not Kosher, the email
demonstrates Arnone's view that Common Fare is Kosher.  The
November 10 email does not support personal liability on the
part of Arnone.

Finally, plaintiff mailed a letter to Arnone dated February
29, 2012 in which he complained that he was being denied a
Kosher diet, that his yarmulke was confiscated, and that he was
not allowed to use his own tallit or tefillin and therefore was
left with no tallit and an old, non-Kosher set of tefillin
provided by DOC.  See ECF No. 135-3 at 48-49.  As noted above,

the mere receipt of a letter cannot establish personal involvement by a supervisor. <u>Delee</u>, 729 F. App'x at 32 (citing <u>Colon</u>, 58 F.3d at 873-74). Additionally, Arnone provided a declaration stating that he has no expertise in the Jewish religion and therefore delegated such issues to the appropriate personnel. ECF No. 126-1 at 3. Plaintiff has provided no evidence to the contrary.

For his claim against Murphy, plaintiff relies on grievances he submitted to Murphy regarding meals he was given in the medical unit. He complained that the Common Fare diet was not Kosher, his food was not being prepared using Kosher principles, and at times his meals arrived frozen or unwrapped. He also points to grievances related to religious clothing, candles and lamps, access to grape juice for religious purposes, and Passover meals, including special matzoh for Passover.[16] This evidence is insufficient to support a verdict against Murphy for several reasons.

First, plaintiff's only admissible evidence regarding whether his Common Fare meals were Kosher is his deposition testimony. He testified that Rabbi Robert Schectman, who was then a DOC chaplain, originally told him that Common Fare meals

---

[16] Plaintiff's grievances included other complaints related to religion, but I address only those relevant to his articulated claims.

were Kosher, but that "by the end of [plaintiff's] time [at MWCI] . . . [Rabbi Schectman] admitted to [plaintiff] that" Common Fare was not Kosher. ECF No. 132-3 at 24. Rabbi Schectman also told plaintiff that the utensils used in the preparation of his food were not Kosher, "which means that everything the utensils touched were not [K]osher." Id. at 25. Plaintiff further testified that an anonymous guard told him that his microwave, which was supposed to be kept separate for Kosher purposes, had been used to make bacon. Id. at 24.[17]

However, there is no evidence in the record to suggest that Murphy was aware of his subordinates' admissions. He relied on his staff to handle plaintiff's food-related concerns. See Murphy Dec., ECF No. 126-11 ¶¶ 59-83. Specifically, he counted on Rabbi Schectman to ensure that plaintiff's food was Kosher and on Deputy Warden Steven Frey to investigate plaintiff's complaints regarding his food. Id. ¶¶ 64-67, 73. Murphy was not present at a meeting where DOC staff discussed how to prepare plaintiff's food. Id. ¶ 69. He knew that DOC purchased a microwave oven "solely to be used for [plaintiff's] Kosher meals." Id. ¶ 71. There is no evidence that plaintiff ever complained to Murphy that the microwave had been used for bacon or that the utensils were not Kosher.

---

[17] These statements are not hearsay because they were made by DOC employees in the scope of employment. Fed. R. Evid. 801(d)(2).

Plaintiff and his advocates did complain to Murphy
repeatedly that his meals were not Kosher.  E.g., ECF No. 135-1
at 26 (complaint dated December 25, 2011).  But Rabbi Schectman
explicitly assured Murphy on December 29, 2011 that he had
"inspected the arrangements for preparing [K]osher food" and
that everything was appropriate, including "[t]he separateness
of the utensils used."  Id. at 33.  Indeed, Rabbi Schectman
wrote to Murphy that he was "certain that [he] could document
and testify to [the food and the method of their preparation]
being [K]osher."  Id.  Even if Rabbi Schectman told plaintiff
toward the end of his time at MWCI -- that is, in late 2012 --
that Common Fare is not Kosher, there is no evidence that such
information was ever passed on to Murphy.  Murphy cannot be
found to have the requisite knowledge to be held personally
liable on this claim.[18]

---

[18] The merits of plaintiff's complaints are also in doubt.
Courts in this District have routinely found the Common Fare
menu to comport with Kosher restrictions.  See, e.g., Hayes v.
Bruno, 171 F. Supp. 3d 22, 34 (D. Conn. 2016); Wortham v. Lantz,
No. 3:10-CV-1127 (DJS), 2014 WL 4073201, at *4 (D. Conn. Aug.
13, 2014).  In any event, Murphy and Arnone would likely be
entitled to qualified immunity even if they could be held
personally liable.  E.g., Hayes v. Bruno, No. 3:14-CV-1203
(AWT), 2015 WL 13640503, at *3 (D. Conn. July 2, 2015) ("Absent
any cases holding that [C]ommon [F]are meals are not [K]osher,
and in light of evidence submitted in Thompson regarding meal
preparation in accordance with Jewish dietary law, the court
concludes that the defendants reasonably believed that they were
not violating the plaintiff's constitutional rights.
Accordingly, the defendants are shielded by qualified immunity

Plaintiff also complained to Murphy on a few occasions that he received meals that were still frozen or were unwrapped and therefore not Kosher. See ECF No. 135-1 at 17 (complaining about instances of frozen meals on November 18 and December 5, 2011 and noting that the December 5 meal was also unwrapped); id. at 19 (noting an unwrapped meal on December 6). The issues were addressed at meetings on December 8 and 20 that included plaintiff, Deputy Warden Frey, Rabbi Schectman, and kitchen supervisors. Id. at 17, 19, 23. When on one occasion plaintiff's Matzoh arrived wet and inedible, the issue was resolved the same day. See ECF No. 135-2 at 5; id. at 15. As previously noted, "[i]n the absence of an ongoing violation -— one that is capable of mitigation —- [Murphy] cannot be held personally liable." Young, 15 F. Supp. 3d at 192-93.[19]

At times, plaintiff's advocates offered to sell or donate Kosher and Kosher-for-Passover meals and items to DOC. E.g., ECF No. 135-1 at 35 (email from Rabbi Katz on December 15,

_____

as to any claims for damages." (citing Thompson v. Lantz, No. 3:04-cv-2084 (AWT) (D. Conn. Mar. 28, 2011)).
[19] Furthermore, there is no evidence in the record that these incidents amounted to more than negligence on the part of DOC staff. "But mere negligence is insufficient as a matter of law to state a claim under section 1983." Poe v. Leonard, 282 F.3d 123, 145 (2d Cir. 2002) (citing Davidson v. Cannon, 474 U.S. 344, 347-48 (1986)); Odom v. Dixion, No. 04-CV-889F, 2008 WL 466255, at *11 (W.D.N.Y. Feb. 15, 2008) (citing Poe and Davidson in the First Amendment context).

2011).  Moreover, plaintiff and his supporters complained that
he should be receiving grape juice for the Sabbath and that he
should be able to light candles on all eight nights of Hanukkah.
E.g., id.  Plaintiff also once complained to Murphy about not
being able to engage in collective worship.  See ECF No. 135-2
at 24 (referring to "praying in a minyan").  Defendants have
explained that each of these requests was denied to protect
legitimate penological interests.  Specialty food items cannot
be donated or purchased because that might create the appearance
of special treatment, there would be no way to ensure that the
food was safe, contraband could be smuggled in through the food,
and permitting inmate requests for specialty items could strain
logistical and financial resources.  Grape juice gives rise to
safety concerns because inmates may try to brew it into wine,
which can pose health risks.  Individuals in the medical unit
are not permitted to leave to attend collective religious
services due to safety and security concerns regarding the
smuggling of medical items out of the unit.[20]  Candles pose
obvious safety risks.

---

[20] In his deposition testimony, plaintiff states that he
witnessed Muslim inmates leave the medical unit to attend
collective services.  He says that Rabbi Schectman told him that
he had been told that plaintiff could not leave.  Nothing in
plaintiff's testimony suggests that Murphy caused or even knew
about this discrepancy.

Defendants have met their burden of coming forward with legitimate penological reasons for the denial of plaintiff's requests, and plaintiff provides no evidence that these concerns were irrational.  Officials in the defendants' positions could reasonably believe that DOC's policies were related to legitimate penological interests.  See, e.g., Salahuddin, 467 F.3d at 277 (noting that other inmates' safety is a legitimate penological interest); Benjamin v. Coughlin, 905 F.2d 571, 579 (2d Cir. 1990) ("[L]egitimate security interests have been raised by the prison authorities, who must be accorded great deference in these matters. . . . [Moreover, c]ourts . . . are reluctant to grant dietary requests where the cost is prohibitive or the accommodation is administratively unfeasible." (citations omitted)); Kahane v. Carlson, 527 F.2d 492, 495 (2d Cir. 1975) (holding that the First Amendment prevents prison authorities from "unnecessarily" burdening the plaintiff's "observance of his dietary obligations," but noting that "[p]rison authorities have reasonable discretion in selecting the means by which prisoners' rights are effectuated" and that the details of the methods used "are best left to the prison's management which can provide from the food supplies available within budgetary limitations"); Henry v. Schriro, No. 10 CIV. 7573 SAS, 2011 WL 3370394, at *2 (S.D.N.Y. Aug. 2, 2011) (finding that reducing perceptions of favoritism is a legitimate

penological interest); <u>Vega v. Lantz</u>, No. 3:04-CV-1215 (DFM),
2009 WL 3157586, at *6 (D. Conn. Sept. 25, 2009) (same), <u>amended</u>
<u>on other grounds on reconsideration</u>, No. 3:04-CV-1215 (DFM),
2012 WL 5831202 (D. Conn. Nov. 16, 2012).

Plaintiff also complained to Murphy that his yarmulke had
been confiscated twice and that he had been forced to remove his
tzitzit before court in November 2011.  <u>See</u> ECF No. 135-2 at 16;
<u>see also</u> <u>id.</u> at 27, 29.  He mentioned the yarmulke issue only in
passing and provided no further details; in any event, there is
no evidence of any ongoing violation that Murphy could have
prevented.  Murphy investigated the tzitzit incident and found
that the Correction Officers who had removed the garment were
acting on a memorandum posted by another prison official
specifying which types of clothing could be worn on a court
trip.  <u>Id.</u> at 27.  The issue was corrected: plaintiff
acknowledged in his deposition that after that incident, he was
allowed to wear the item.[21]  ECF No. 132-3 at 22.

Finally, plaintiff complained that he needed a Kosher lamp
for Rosh Hashanah.  ECF No. 135-2 at 36.  However, he did not
request it far enough in advance.  Ultimately, his request to

---

[21] Plaintiff also asserted at his deposition that it took a month
or two to get the tzitzit in the first place and that he went
without the yarmulke for as long as a week or two when it
was confiscated.  However, there is no evidence that these concerns
were articulated to Murphy.

purchase the lamp was approved.  See ECF No. 135-2 at 39; id. at
48.  Again, there was no ongoing violation.

  a. ADA and Rehabilitation Act

Plaintiff alleges that the State failed to reasonably
accommodate his disabilities by not providing adequate medical
care or necessary medical equipment and by denying him access to
the library facilities and outdoor recreation area, in violation
of his rights under the ADA and Rehabilitation Act.[22]  See 29
U.S.C. § 794(a) (Rehabilitation Act); 42 U.S.C. § 12132 (ADA).
Both statutes "prohibit discrimination against qualified
disabled individuals by requiring that they receive 'reasonable
accommodations' that permit them to have access to and take a
meaningful part in public services and public accommodations."
Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 85 (2d Cir.),
opinion corrected, 511 F.3d 238 (2d Cir. 2004).  "[T]o establish
a prima facie violation under these Acts, [plaintiff] must
demonstrate (1) that [he] is a 'qualified individual' with a
disability; (2) that the defendants are subject to one of the
Acts; and (3) that [he] was 'denied the opportunity to

_____

[22] Though there are "subtle differences" between the ADA and
Rehabilitation Act, the standards governing the two statutes are
generally the same.  Henrietta D. v. Bloomberg, 331 F.3d 261,
272 (2d Cir. 2003) (quoting Henrietta D. v. Giuliani, 119 F.
Supp. 2d 181, 206 (E.D.N.Y. 2000)).  Thus, "unless one of those
subtle distinctions is pertinent . . . , [courts] treat claims
under the two statutes identically."  Id.

participate in or benefit from defendants' services, programs, or activities, or [was] otherwise discriminated against by defendants, by reason of [his] disabilit[y].'" Id. (quoting Henrietta D., 331 F.3d at 272). Defendants challenge only plaintiff's ability to satisfy the third prong.[23]

Plaintiff may demonstrate discrimination based on disparate treatment or failure to make reasonable accommodations. Henrietta D., 331 F.3d at 275-76 (citing Dunlap v. Ass'n of Bay Area Gov'ts, 996 F. Supp. 962, 965 (N.D. Cal. 1998)). Plaintiff's complaint is framed under the latter theory, so the issue is whether he "could achieve meaningful access, and not whether the access [he] had (absent a remedy) was less meaningful than what was enjoyed by others." Id. at 275.

---

[23] Defendants also argue that they are entitled to sovereign immunity under the ADA. However, they oversimplify the analysis required to determine whether sovereign immunity applies in an ADA case. The Supreme Court has held that in such cases, courts must determine, "on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II [of the ADA]; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." United States v. Georgia, 546 U.S. 151, 159 (2006). Additionally, many courts in this Circuit have held that claims under the Rehabilitation Act are not barred by sovereign immunity. See Stiegman v. N.Y. State Office of Info. Tech. Servs., No. 1:19-CV-18 (GTS/CFH), 2019 WL 1762900, at *6 (N.D.N.Y. Apr. 22, 2019) (collecting cases); Pierce v. Semple, No. 3:18-CV-1858 (KAD), 2018 WL 6173719, at *3 (D. Conn. Nov. 26, 2018) (same). I need not decide these issues because I find that plaintiff's claims fail for other reasons.

Plaintiff still "must demonstrate that a denial of benefits occurred 'because of the disability.'" Andino v. Fischer, 698 F. Supp. 2d 362, 379 (S.D.N.Y. 2010) (quoting Henrietta D., 331 F.3d at 278). "In other words, there must be something different about the way the plaintiff is treated 'by reason of . . . disability.'" Henrietta D., 331 F.3d at 276 (quoting 42 U.S.C. § 12132).

The Second Circuit has held that in cases involving reasonable accommodations in the prison context, courts should employ "the well-established ADA and RA burden shifting framework." Wright v. N.Y. State Dep't of Corr., 831 F.3d 64, 76 (2d Cir. 2016). Under that framework,

> the plaintiff bears the initial burdens of both production and persuasion as to the existence of an accommodation that is facially reasonable. The burden of persuasion then shifts to the defendant to rebut the reasonableness of the proposed accommodation. This burden of non-persuasion is in essence equivalent to the burden of showing, as an affirmative defense, that the proposed accommodation would cause the defendant to suffer an undue hardship.

Id. (internal quotations marks and alterations omitted) (citations omitted). "[A] reasonable accommodation need not be perfect or the one most strongly preferred by the plaintiff, but it still must be effective." Id. at 72 (internal quotations marks and alterations omitted); see also McElwee v. County of Orange, 700 F.3d 635, 641 (2d Cir. 2012) ("Although a public entity must make 'reasonable accommodations,' it does not have

to provide a disabled individual with every accommodation he requests or the accommodation of his choice."). The reasonableness inquiry is "fact-specific," and "[a] defendant is entitled to summary judgment only if the undisputed record reveals that the plaintiff was accorded a plainly reasonable accommodation." Wright, 831 F.3d at 72-73 (internal quotation marks and alterations omitted). Courts must be "sensitive to the fact that prisons are unique environments with heightened security and safety concerns." Id. at 75. Nevertheless, "because the ADA and RA unmistakably apply to State prisons and prisoners, [DOC] is statutorily required to ensure that all of their inmates, including [plaintiff], have the opportunity effectively to access the services and programs [DOC] provides." Id. "Title II of the ADA, therefore, requires that once a disabled prisoner requests a non-frivolous accommodation, the accommodation should not be denied without an individualized inquiry into its reasonableness." Id. at 78.

On the record here, considering only admissible evidence and drawing all permissible inferences in plaintiff's favor, plaintiff cannot satisfy his initial burden to show "the existence of an accommodation that is facially reasonable." Id. at 76. There are two reasons for this. First, the complaint alleges that plaintiff was denied reasonable accommodations for "medical care and necessary medical equipment in conformance

with ADA requirements."  Third Amended Compl., ECF No. 58 ¶ 9.
But it does not specify how plaintiff's medical care was
deficient under the ADA or Rehabilitation Act, nor does it
articulate what reasonable accommodations plaintiff should have
been provided.  Plaintiff has thus not satisfied his initial
burden under Wright.  831 F.3d at 76.  Plaintiff's submissions
in opposition to the motion for summary judgment make no attempt
to defend this claim under the ADA and Rehabilitation Act; he
focuses instead on the personal involvement of the individual
defendants, a question under § 1983 that does not apply to the
claim under the ADA and Rehabilitation Act.

Second, plaintiff alleges that he received insufficient
access to the library and to outdoor recreation.  Both are
considered programs, services, and activities to which disabled
detainees must be given meaningful access.  See id. at 73.  As
noted above, defendants argue that individuals in the medical
unit are not allowed to leave the unit due to safety and
security concerns.  In his deposition, plaintiff testified that
Murphy told him he could not go to the library because DOC did
not want him to use the stairs and there was no elevator in the
building -- but he later learned there was an elevator.

Additionally, he stated that other inmates from his pretrial medical unit were allowed to go to the library.[24]

It is undisputed that inmates in the medical unit had access to in-unit books and a typewriter and could request delivery of books from the library. Similarly, there is no dispute that inmates in the medical unit were given recreation time indoors, during which they were often able to leave their rooms and attend activities in the common room. These are plainly reasonable accommodations that balance the need for safety against the need for inmates to have social and recreational time. See Parks v. Blanchette, 144 F. Supp. 3d 282, 340 (D. Conn. 2015) ("Statutory rights applicable to the nation's general population must be considered in light of effective prison administration. In evaluating whether a given modification is reasonable in the prison context, the Court must take into account the legitimate interests of prison administrators in maintaining security and order and operating an institution in a manageable fashion." (internal quotation marks, alterations, and citations omitted)). Plaintiff has not

---

[24] This testimony does not create a triable issue of fact. If the inmates who were permitted to leave the unit had disabilities similar to plaintiff's, then DOC's denials of plaintiff's access to the library and outdoor recreation cannot have been "by reason of" plaintiff's disability. If the other inmates were not disabled, then it is a question of whether plaintiff was reasonably accommodated, which I analyze below.

suggested any other reasonable accommodations that he should
have received.  Cf. Colon v. N.Y. State Dep't of Corr. & Cmty.
Supervision, No. 15 CIV. 7432 (NSR), 2017 WL 4157372, at *7
(S.D.N.Y. Sept. 15, 2017) (dismissing ADA and Rehabilitation Act
claims because the plaintiff "failed to allege why the
accommodation he seeks is more reasonable for blind prisoners ——
and legally required —- when compared with the accommodations he
already received").  Plaintiff has not met his prima facie
burden to establish an ADA or Rehabilitation Act claim.

Plaintiff's claim appears to be more in the nature of a
challenge to the conditions of confinement than one brought
under the ADA or Rehabilitation Act.  The record does not show
that plaintiff requested any "reasonable accommodations" to
provide meaningful access to the library or recreation to him as
a disabled individual.  This case is not, therefore, akin to one
like Walker v. City of New York, where the "[p]laintiff
repeatedly requested, and was denied, reasonable accommodations
for visually impaired persons to access the law library."  367
F. Supp. 3d 39, 54 (S.D.N.Y. 2019); see also, e.g., Owens v.
Chester County, No. CIV. A. 97-1344, 2000 WL 116069, at *10
(E.D. Pa. Jan. 31, 2000) (allowing ADA claim to proceed against
County where the plaintiff alleged that prison officials "denied
him the use of his crutches or a wheelchair," preventing him
from accessing the library or "participating in the yard

34

activities"). Rather, the evidence in this case reveals that plaintiff's complaints were directed at the restrictions on his ability to go to the library in person or attend outdoor recreation. In other words, his protest was against DOC's policies in the medical unit. A conditions-of-confinement claim is properly brought under the Fourteenth Amendment, not the ADA and Rehabilitation Act. See Darnell, 849 F.3d at 29. Perhaps in recognition of this, plaintiff seeks in his opposition to defendants' motion to reframe the claim as a constitutional one brought against Murphy. See ECF No. 132 at 7. As noted, however, plaintiff may not bring new claims at this stage without seeking permission to do so, which he has not done. See Greenidge, 446 F.3d at 361.[25]

III. Conclusion

Accordingly, defendants' motion for summary judgment is granted. The Clerk may enter judgment and close the file.

---

[25] Arnone and Murphy argue that they are entitled to qualified immunity. Even when a plaintiff can establish that a defendant was personally involved in a constitutional violation, a § 1983 claim must be dismissed if qualified immunity applies. Officials "are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)). Under this standard, Arnone and Murphy are likely entitled to qualified immunity but because the plaintiff cannot prove that they were personally involved in a violation, I do not reach the issue of qualified immunity.

So ordered this 30th day of September 2019.


                               _____/s/ RNC_____
                                    Robert N. Chatigny
                               United States District Judge